In re VILLA WEST ASSOCIATES,
Debtor.

Darcy D. WILLIAMSON,
Trustee, Plaintiff,

v.

Fred C. KAY, Defendant and Third–Party Plaintiff/Appellee,

v.

Leslie M. BURNS, et al., Third–Party Defendants/Appellants.

Nos. 88–40614–7, 91–4044–SAC.
Adv. No. 89–7309.

United States District Court,
D. Kansas.

Feb. 5, 1993.

Robert J. Bjerg, Miller Law Firm, Kansas City, MO, Karen D. Wedel, Walters, Bender & Strohbehn, Kansas City, MO, for MN Associates, Thomas W. Van Dyke, Leslie M. Burns, Kirk W. Carpenter, Paul R. Virden, Bernard Hainen, E. Jerome Hanson, M.D., C. Thomas Hitchcock, M.D., Jerry Warden, James C. Brenneman, Steven R. Duvall, Jude Nally, H. Elvin Knight, Jr., L. Kenneth Hubbell, John A. Alholm and Don C. Freburg.

Darcy D. Williamson, Topeka, KS, Bruce J. Woner, Woner, Glenn, Reeder, Lowry & Girard, Topeka, KS, for Darcy D. Williamson.

Jan M. Hamilton, Hamilton, Peterson, Tipton & Keeshan, Topeka, KS, for Fred C. Kay.

Cynthia L. Reams, Weisenfels & Vaughn, P.C., Kansas City, MO, for Douglas Kay and Ann Kay.

## MEMORANDUM AND ORDER

CROW, District Judge.

This case comes before the court on appeal from a bankruptcy adversarial proceeding. On March 8, 1991, following a trial, the bankruptcy court entered judgment. The appellants, who are some of the limited partners in Villa West Associates,[1] raise several issues on appeal. The appellees have filed a response and MN associates have filed a reply.[2]

This case arises out of the bankruptcy of Villa West Associates, a Kansas limited partnership. MN Associates' appeal primarily concerns the liabilities and obligations of the limited partners under the limited partnership agreement and the limited partners obligations to other members of the limited partnership.

Having considered the briefs of counsel and the applicable law, the court is now prepared to rule.

### Factual Overview

While some of the facts presented by this appeal are disputed, most of the issues raised on appeal are purely questions of law. The court will endeavor to set forth a chronological recitation of the facts so that the issues on appeal can be understood.

On August 26, 1983, Villa West Associates was formed as a limited partnership pursuant to the Kansas Uniform Limited Partnership Act. On January 1, 1986, the limited partnership agreement became subject to the Kansas Revised Uniform Limited Partnership Act. The limited partnership agreement is also subject to the Kansas Uniform Partnership Act, K.S.A. 56–301 et seq., except insofar as the ULPA

1. Appellants, Leslie Burns, Steven R. Duvall, Jude Nally, H. Elvin Knight, Jr., Thomas W. VanDyke, Kirk Carpenter, Paul R. Virden, Bernard Hainen, E. Jerome Hanson, Jr., M.D., C. Thomas Hitchcock, M.D., Jerry Warden, James C. Brenneman, L. Kenneth Hubbell, John A. Alholm and Don C. Freburg, are limited partners of Villa West Associates and are also the general partners of a separate Missouri general partnership called MN Associates. For simplicity, the court will generally refer to the appellants as MN Associates. The appellees, Fred Kay, and his parents, Doug and Ann Kay, are the remaining limited partners of Villa West Associates. Neither Fred Kay or his parents, Doug and Ann Kay, are general partners of MN Associates.

2. The appellees, Fred C. Kay, and his parents, Doug and Ann Kay, filed a motion to reject and/or refuse to consider MN Associates' reply as untimely. On June 2, 1992, by minute order, the court denied the Kay's motion and considered defendants/appellants reply brief as timely.

and RULPA are inconsistent with the Villa West Associates agreement. K.S.A. 56–306(b).

Villa West Associates was formed as a single asset commercial real estate partnership which owned a shopping center known as "Villa West Shopping Center" located at 29th Street and Wanamaker in Topeka, Kansas. Fred C. Kay is and always has been Villa West Associates's sole general partner.

Villa West Associates solicited subscribers through a Confidential Private Placement Memorandum. Subscribers to the partnership contracted to purchase interests in the limited partnership at $20,000 per unit by executing a Limited Partner Subscription Agreement. Along with the Subscription Agreement, each potential limited partner delivered to the General Partner a check for a portion of the initial cost of their limited partnership interest ("Initial Capital Contribution"), an executed promissory note for the balance of the Initial Capital Contribution, an executed Signature Page and Participation Agreement (Signature Page) and an executed Continuing Guaranty Escrow Agreement in favor of Metro North State Bank (MNSB).

The limited partners, excluding Fred Kay (who holds a one-half unit limited partnership interest) and his parents, Douglas and Ann Kay (who hold one unit of the limited partnership interest collectively), constitute the appellants in this case. The appellees are Fred Kay and his parents, Donald and Ann Kay. The trustee in bankruptcy takes no position on the issues raised in this appeal.

At the time the limited partnership was formed, the limited partners knew that Villa West Associates would be financing the property through a $2,300,000.00 nonrecourse mortgage loan from the Travelers Insurance Company (TIC). TIC required Villa West Associates to post a $225,000 irrevocable letter of credit as a condition of the loan. The limited partners knew at the time that Villa West Associates was formed that it would obtain recourse financing from MNSB in the amount of $300,000 for operating capital, and that

MNSB would be posting the $225,000 letter of credit required by TIC, requiring a $225,000 recourse note from the Villa West Associates.

At subscription, the limited partners knew the two notes were to be secured by each limited partner's personal Continuing Guaranty. The Subscription Agreement voluntarily signed by each limited partner required each limited partner to assume personal liability for a 125% pro rata share of the notes by executing a Continuing Guaranty.

In addition to committing their Initial Capital Contribution and Continuing Guaranty of the two notes, each limited partner was required under certain circumstances to make additional capital contributions to Villa West Associates as set forth in paragraph 9 of the agreement, or face dilution of their limited partnership interest. Paragraph 9 provides:

9. *Additional Capital Contributions.* In any year in which the Partnership incurs operating deficits, and funds for the payment thereof are not available and cannot be borrowed on terms acceptable to the General Partner, then each partner, general or limited, shall be required to contribute his proportionate share of such deficit as an additional capital contribution (determined in accordance with the percentages for the division of profits and losses provided in Paragraph 8 hereof, as subsequently modified by any other provisions in this Agreement) in an amount not to exceed his proportionate share of the excess of operating expenses and mortgage payments over gross revenues from the property. In the event any partner fails to make any such required contribution within thirty (30) days following the receipt of written notice of the requirement to make such a contribution, such partner shall be deemed in default and the remaining Limited Partners shall have the right to make such additional capital contribution pro rata and thereby increase their percentage interests in the capital of the partnership. In the event all Limited Partners have declined to pro-

vide all or any portion of such additional capital, then notwithstanding anything to the contrary herein contained, the General Partner is authorized to admit additional Limited Partners as necessary to raise the additional capital. The percentage interests in the capital and profits and losses of the Partnership shall be adjusted to reflect such additional cash capital contributions of the existing Partners and the admission and cash capital contributions of any Limited Partners to be added.

In relevant part, the Villa West Associates limited partnership agreement further provides:

10. *Default in Making Capital Contribution.* Any Limited Partner who fails to make a capital contribution to the Partnership in the amount and at the time called for in the promissory note signed by such Limited Partner and in this Limited Partnership Agreement shall be in default. The Limited Partner shall be notified of the default by the General Partner and shall be given five days in which to make the required capital contribution to the Partnership and cure the default. In the event the Limited Partner fails to make the required capital contribution to the Partnership within the five-day period:

(a) The General Partner shall notify, in writing, the remaining Limited Partners of any default to later than 20 days following the date upon which the defaulted limited Partner's payment was originally due.

(b) Any Limited Partner, other than the defaulted Limited Partner may, within 10 days thereafter, purchase the Limited Partnership interest of the defaulted Limited Partner by notifying the General Partner and by making payment:

(1) To the defaulted Limited Partner, an amount equal to 50% of such defaulted Partner's then capital, and

(2) To the Partnership, the amount of the capital contribution required upon which the defaulting Limited Partner defaulted.

(c) Should more than one Limited Partner notify the General Partner of an intention to purchase the Limited Partnership interest of the defaulting Limited Partner, then each such Limited Partner desiring to purchase the defaulted Limited Partner's interest may purchase his pro rata portion according to such purchasing Limited Partner's then Percentage Share of Capital. The purchase shall be made in accordance with the provisions of subparagraph (b) above.

(d) If no Limited Partner desires to purchase the Limited Partnership interest of the defaulted Limited Partner, the General Partner shall arrange for a private sale of such interest. The defaulted Limited Partner shall receive from the proceeds of the sale the sale amount (but in any case not an amount which exceeds the book value of his capital on the date of sale of his interest) less any expenses incurred by the Partnership in connection with the sale. The Partnership shall receive the remainder of the proceeds of the sale, if any.

.     .     .     .     .

14. *Management, Duties and Restrictions.*

(c) *Limited Partners.* No Limited Partner shall participate in the management of the partnership business. No Limited Partner or General Partner shall have the right to withdraw his capital contribution. Except as otherwise provided in Paragraph 22 hereof, no Limited Partner shall have the right to demand or receive property other than cash in return for his interest in the Partnership. No Limited Partner shall have priority over any other Limited Partner. No Limited Partner shall be personally liable for any of the debts of the Limited Partnership or any of the losses thereof beyond the amount committed by him to the capital of the Limited Partnership and his share of undistributed profits of the Limited Partnership. The Limited Partners consent to any lease by the General Partner on behalf of the Partnership on any or all of the Property on such terms and conditions as may be

determined by the General Partner and to the employment when and if required of such brokers, agents and attorneys as the General Partner may determine, notwithstanding that any party thereto may have an interest therein.

During the term of Villa West Associates's existence, interest payments were made on the two notes. The interest payments were treated as expenses of Villa West Associates and contributed to Villa West Associates's losses which were then passed through to the limited partners.

Villa West Associates experienced operating deficits throughout its existence. Initially, operating deficits were funded by monies loaned to Villa West Associates by the general partner, Fred Kay, personally or from other companies for which he served as president and chairman of the board. At some point, Fred Kay determined that operating deficits could not be met by borrowing additional money, and that an additional capital contribution would be necessary. On November 9, 1987, Fred Kay made a call upon the limited partners for an additional capital contribution pursuant to paragraph 9 of the limited partnership agreement in the amount of $150,000 to cover existing operating deficits. None of the limited partners honored that call for additional capital.

On March 10, 1988, TIC filed suit to foreclose the property. A week later, on March 17, 1988, Fred Kay corresponded with the limited partners and advised them of the precarious financial condition of the partnership and warned that additional substantial capital contributions would be necessary. On May 12, 1988, Villa West Associates filed for protection under Chapter 11 of the Bankruptcy Code. On August 29, 1988, the letter of credit was drawn by TIC at MNSB. As a consequence, the two notes matured or otherwise became due on August 29, 1988. Fred Kay, as general partner, was unable to borrow funds on acceptable terms to repay the notes.

Unknown to Fred Kay and his parents, Doug and Ann Kay, on or about January 30, 1989, the other limited partners formed a Missouri general partnership, MN Associates, to purchase the two notes and continuing guarantees from MNSB. The two notes ($300,000 and $225,000) plus all of the guaranty agreements were purchased from MNSB for $542,669.18.

At the time of its inception, the Kays were not advised of and were excluded from participation in MN Associates. MN Associates was formed, in part, to avoid suit by MNSB. In addition, by forming MN Associates to acquire the notes from MNSB, those limited partners could require Fred Kay to pay the attorney fees. One reason that Doug and Ann were not invited to participate in MN Associates was the assumption that they would not choose to join in an effort to sue their own son.

On March 14, 1989, MN Associates has made written demand on Fred Kay as a general partner for payment of the Notes and on Doug and Ann Kay as limited partners for payment of the full 125% amount of their respective Continuing Guarantees and for their pro rata share of attorneys' fees. MN Associates holds the notes and Continuing Guarantees from all of the limited partners. MN Associates has not made demand for payment on any Continuing Guaranty other than the Kays.

On March 24, 1989, Fred Kay wrote the limited partners on behalf of Villa West Associates and demanded an additional capital contribution in the aggregate amount of $434,503.91 in accordance with paragraph 9 of the Villa West Associates agreement. At the time, Villa West Associates had $258,094.86 on hand to contribute toward the partnership's obligations, which were primarily comprised of the notes and the general partner loans. The sums on hand were not sufficient to cover these principal obligations. The call for an additional capital contribution was not honored by any of the limited partners comprising MN Associates. Doug and Ann Kay did advise Fred Kay that they intended to honor the capital call. Fred Kay, however, advised them to wait until further notice to send their contribution since none of the other limited partners were honoring the call.

After receiving MN Associates, March 14, 1989, demand for payment on their continuing guaranty, Doug and Ann Kay requested verification from MN Associates that it was, in fact, the holder of the notes and the continuing guaranty. Upon receipt of that information, Doug and Ann Kay offered to pay MN Associates their pro rata share of the notes after reduction for the amounts on hand in the partnership available to pay on the notes. Doug and Ann Kay also volunteered to be accountable for their pro rata share of any deficiency and requested an opportunity to participate with MN Associates, pro rata, in any recoveries from the general partner, Fred Kay. MN Associates subsequently offered that Doug and Ann Kay stand in the same position with respect to the two defaulted notes as all the other limited partners who formed MN Associates.[3]

On March 7, 1989, MN Associates filed a proof of claim regarding the two notes against Villa West Associates's bankruptcy estate. On June 2, 1989, Villa West Associates's Chapter 11 proceeding was converted to Chapter 7 and Darcy D. Williamson was appointed as Trustee. On September 15, 1989, the Trustee initiated an adversary proceeding against Fred Kay as the general partner pursuant to 11 U.S.C. § 723, claiming the general partner was responsible for any deficiency in the bankruptcy estate. The Trustee and Fred Kay as general partner have objected to MN Associates' claim. MN Associates' claims creates the deficiency in the bankruptcy estate.

In response to the § 723 action, Fred Kay as general partner asserted a third party proceeding against the limited partners because of their breach of their obligation to make the additional capital contribution. Doug and Ann Kay subsequently filed a cross-claim against the limited partners who founded MN Associates for breach of fiduciary duty.

A trial to the court was conducted on all issues on July 9, 1990. On March 8, 1991, the court entered its Memorandum Decision and Order of Judgment. In that decision, the bankruptcy court held that MN Associates has a valid claim against the estate for the amount it paid for the notes. The bankruptcy court went on to hold, however, that under the Villa West Associates agreement the limited partners were mandatorily obligated to honor the general partner's call for additional capital contributions and that the limited partners liability for those capital contributions was not limited to the amount of their investment in Villa West Associates, but instead, the limited partners had obligated themselves personally to make additional capital contributions. Therefore, MN Associates' claim against the estate was offset by the additional capital contributions owed by the limited partners who formed it. Fred, Doug and Ann Kay were also required to pay the additional capital contributions they owed.

The bankruptcy court also found that the limited partners owe a fiduciary duty to each other and the partnership, and that by forming MN Associates for their own self-interest, the limited partners had breached that duty. Despite the provision in the continuing guaranty and escrow agreement for the collection of reasonable attorney's fees, MN Associates was not allowed to recover its attorneys' fees due to the limited partners' breach of fiduciary duty. MN Associates timely appeals.

### Issues on Appeal

This appeal presents two primary issues: (1) Whether the bankruptcy court erred in finding that the appellants, as the limited partners of Villa West Associates, were obligated to honor the general partner's call for additional capital and that the amount of the § 723 deficiency should be off-set by their unpaid capital contributions?

(2) Whether the bankruptcy court erred in finding that the appellants, by forming MN Associates to purchase the two defaulted notes and guarantees, violated a fiduciary duty to the other limited partners or to the partnership?

---

3. The bankruptcy court found these actions by the limited partners who formed MN Associates to breach the fiduciary duty they owed to the other limited partners and to the partnership.

### Standard of Review

On appeal from the bankruptcy court, the district court sits as an appellate court. *See* 28 U.S.C. § 1334(a). Findings of fact are not to be set aside unless clearly erroneous; conclusions of law are reviewed *de novo*. *Virginia Beach Federal Sav. and Loan Ass'n v. Wood*, 901 F.2d 849, 851 (10th Cir.1990); *In re Schneider*, 864 F.2d 683, 865 (10th Cir.1988); *see* Bankruptcy Rules 7052 and 8013. "Just as the court of appeals may not conduct an evidentiary hearing for a bankruptcy appeal, so too a district court may not conduct such hearing when it is acting in its capacity as an appellate court. In a bankruptcy appeal, a district court may alter or amend its judgment pursuant to Fed.R.Civ.P. 59(e), but may not conduct a hearing to take additional testimony or other evidence." *In re Branding Iron Motel, Inc.*, 798 F.2d 396, 399 (10th Cir.1986).

When reviewing factual findings, an appellate court is not to weigh the evidence or reverse the finding because it would have decided the case differently. *Id.* at 400. The Tenth Circuit has held in the bankruptcy context that "[t]he bankruptcy court's findings should not be disturbed absent the most cogent reasons appearing in the record." *Id.* (quoting *In re Reid*, 757 F.2d 230, 233–234 (10th Cir. 1985)). A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Hall v. Vance*, 887 F.2d 1041, 1043 (10th Cir.1989).

### Analysis

Whether the bankruptcy court erred in finding that the appellants, as the limited partners of Villa West Associates, were obligated to honor the general partner's call for additional capital and that the amount of the § 723 deficiency should be off-set by their unpaid capital contributions?

The appellants contend that the bankruptcy court erred in several respects. First, the appellant contends that under the terms of the Villa West Associates agreement, the general partner was not entitled or authorized to make a call for additional capital in order to satisfy the two partnership notes in default as paying those notes did not qualify as "operating deficits." Specifically, the appellants contend that Fred Kay, as general partner, failed to demonstrate the existence of an operating deficit, the predicate for any capital call. Second, the appellants contend that the bankruptcy court's construction of the Villa West Associates agreement has essentially converted from limited partners to general partners.

Third, even if the limited partners were obligated to honor the general partner's call for additional capital, the exclusive remedy in the partnership agreement provided that, at most, the limited partners' partnership interests would be forfeited. The appellants contend that nothing in the Villa West Associates agreement allows for imposition of personal liability for additional capital beyond the amount of their initial capital contribution. MN Associates contends that the Villa West Associates limited partnership is typical of limited partnerships in general: the limited partner is simply able to walk away from a bad investment without fear of additional liability beyond that of the initial investment.

In response, the appellees contend that the general partner was entitled to make a call for an additional capital contribution, and in any event, the appellants are raising this argument for the first time on appeal. The appellees also dispute that the bankruptcy court converted the limited partners to general partners. Instead, the appellees contend that the appellants are simply obligated to make the additional capital contribution under the terms of Villa West Associates agreement. Third, the appellees contend that forfeiture of a limited partner's partnership interest is not the exclusive remedy for a limited partner's failure to make a required additional capital contribution, essentially arguing that the limited partners are obligated by the Villa West Associates agreement to make capital con-

tributions above and beyond those amounts initial contributed.

■ The first issue is whether Fred Kay carried his burden of demonstrating that the capital call was appropriate under the Villa West Associates agreement to satisfy an "operating deficit." [4] Paragraph 9 of the Villa West Associates agreement states in pertinent part:

In any year in which the Partnership incurs operating deficits, and funds for the payment thereof are not available and cannot be borrowed on terms acceptable to the General Partner, then each partner, general or limited, shall be required to contribute his proportionate share of such deficit as an additional capital contribution (determined in accordance with the percentages for the division of profits and losses provided in Paragraph 8 hereof, as subsequently modified by any other provisions in this Agreement) in an amount not to exceed his proportionate share of the excess of operating expenses and mortgage payments over gross revenues from the property.

The phrase "operating deficit" is not defined by the agreement. The only possible direct reference to this issue in the bankruptcy court's opinion appears at page 4, which states:

About the same time that [MN Associates] purchased the notes, F. Kay, as general partner of Villa West, wrote the limited partners on March 24, 1989, reporting that although Villa West had $253,094.86 from its operations under Chapter 11, its indebtedness totaled $692,598.77, resulting in a deficit of $434,503.91.

This discussion does not clearly address the argument advanced by MN Associates. As MN Associates argued, this phrase merely repeats the substance of Fred Kay's letter. It is clear, however, that the bankruptcy court impliedly concluded that the debt arising from the default on the two notes was an "operating deficit" as the bankrupt-

cy court held that the limited partners were obligated to honor the call for an additional capital contribution.

The appellees argue that an operating deficit clearly existed as debt service is typically in the nature of an operating expense. MN Associates responds that debt service, which typically consists of smaller but periodic payments of interest and principal, is not synonymous with an acceleration of the entire indebtedness due to a default., MN Associates contends that the call for additional capital in this case was not to pay for "operating deficits" but was instead a " 'trumped-up' call for additional capital in a last ditch effort to escape personal liability under the two notes." Therefore the limited partners were under no circumstance obligated to honor the call.

While the phrase "operating deficit" is not defined in the Villa West Associates partnership agreement, that phrase does not appear to apply to the facts that existed at the time Fred Kay made the additional capital call. Paragraph 9 appears to have contemplated a situation which would have authorized the general partner to demand limited partners to make additional capital contributions to satisfy debts incurred in the on-going operation of the partnership and not as a mechanism by which Fred Kay, as general partner, could avoid personal liability· as the principal debtor on the two promissory notes. The court agrees that Fred Kay failed to carry his burden of proving that the lump-sum payment of the accelerated debt does not appear to fall within the meaning of "operating deficit."

As the appellants suggest, Fred Kay's demand for an additional capital call after receiving MN Associates' demand for payment was merely a means by which Fred Kay could avoid personal liability on the eve of foreclosure on the shopping center property. The court finds that under the circumstances of this case, the bankruptcy court's implicit finding that an "operating deficit" (within the logical meaning of the

---

**4.** The court is satisfied that MN Associates has preserved this issue for appeal. The court has not, however, considered the supplementary evidence submitted to the court which was not presented to the bankruptcy court.

limited partnership agreement) existed is clearly erroneous. Therefore, the limited partners were not required to honor the call for additional capital under the terms of that agreement.

■ The more difficult issue is whether the limited partners were obligated under the Villa West Associates agreement to contribute capital above and beyond their initial investment. Assuming, *arguendo*, that an "operating deficit" did exist and that Fred Kay was authorized to make the call for additional capital, the court also concludes that the only remedies available to the partnership for a limited partner's failure to make an additional capital call are those remedies available under the partnership agreement itself.

The parties stipulated, and the bankruptcy court found that the Villa West Associates partnership agreement was unambiguous. "The doctrine has been well established and frequently applied that where parties have carried on negotiations, and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contracts between them and determines their rights." *Hall v. Mullen*, 234 Kan. 1031, 1037, 678 P.2d 169 (1984). "If a written contract is actually ambiguous concerning a specific matter in the agreement, facts and circumstances existing prior to and contemporaneously with its execution are competent to clarify the intent and purpose of the contract in that regard but not for the purpose of varying and nullifying its clear and positive provisions." *Id.*

■ The construction of a written instrument is a question of law, *Akandas, Inc. v. Klippel*, 250 Kan. 458, Syl. ¶ 1, 827 P.2d 37 (1992), and the interpretation of a written contract which is free from ambiguity is a judicial function. *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, Syl. ¶ 1, 738 P.2d 866 (1987).

■ If a contract is unambiguous, the contract should be enforced according to its terms. Language in a contract is ambiguous if the words in the contract are subject to two or more possible meanings. *NEA–Goodland v. U.S.D. No. 352*, 13 Kan. App.2d 558, 562, 775 P.2d 675 (1989). The court need not look beyond the four corners of the contract where the parties have reduced their agreement to written form and the document is unambiguous on its face. *Koch v. Koch*, 903 F.2d 1333 (10th Cir.1990). "Reasonable rather than unreasonable interpretations of contracts are favored and results which vitiate the purpose or reduce the terms of a contract to an absurdity should be avoided." *Kansas State Bank & Trust v. DeLorean*, 7 Kan. App.2d 246, Syl. ¶ 4, 640 P.2d 343 (1982). The Tenth Circuit has recognized "the universal rule that courts will not make contracts under the guise of judicial interpretation, but must enforce them in accordance with their clear and unambiguous language." *Phico Ins. Co. v. Providers Ins. Co.*, 888 F.2d 663, 667 (10th Cir.1989).[5]

■ In general, one of the primary advantages of a limited partnership is the ability to enjoy profits but at the same time limit personal liability. However, a limited partner may either enter into an agreement or conduct himself in such a manner as to subject himself to personal liability beyond his initial investment. K.S.A. 56–138(1)(b) (ULPA); K.S.A. 56–1a302(a) (RULPA); K.S.A. 56–1a203. In this case, there is no contention that the limited partners acted in a manner inconsistent with their roles as limited partners. The only issue in this case is whether the limited partners contractually obligated themselves to contribute capital above and beyond the amount of their initial capital contribution.

In this case, under paragraphs 9 and 10 [6] the only remedy provided is either the dilu-

---

5.  The court is uncertain why the appellees, having admitted that the Villa West Associates' partnership agreement is unambiguous, continue to rely on the Confidential Private Placement Memorandum as a means of interpreting the partnership agreement.

6.  It appears that paragraph 9 applies to the facts of this case. Paragraph 10 appears to apply to the making of initial capital contributions. In either event, the only remedies available to the partnership for the limited partners' failure to

tion or loss of the limited partners' interest and nothing more. Neither paragraph 9 or 10 contemplate that a limited partner would be subject to suit for defaulting on an additional capital contribution. If the limited partner was mandatorily obligated to make additional capital contributions, what defense, other than challenging the need for such funds, would the limited partner be able to assert? Any other result is contrary to the purpose of forming a limited partnership, and there is nothing in the partnership agreement whereby the limited partners obligated themselves in writing to contribute additional capital. Although paragraph 9 uses the word "shall," the remainder of that paragraph sets forth the general partner's only options following a breach. The list of remedies for default does not include the right to compel payment from a defaulting limited partner.

The bankruptcy court therefore erred in finding that the limited partners were obligated to contribute additional capital under the limited partnership agreement.

> Whether the bankruptcy court erred in finding that the appellants, by forming MN Associates to purchase the two defaulted notes and guarantees, violated a fiduciary duty to the other limited partners or to the partnership?

MN Associates contends that the bankruptcy court erred in finding that it owed the other limited partners a fiduciary duty and that they breached that duty by precluding the other limited partners from joining in MN Associates and enjoying the financial savings concomitant with joining MN Associates. The appellees contend that the bankruptcy court correctly ruled that MN Associates owed both Villa West Associates and its limited partners fiduciary duties and that those duties were breached by the clandestine formation of MN Associates.

The bankruptcy court's decision on the issue of breach of fiduciary duty appears to be tied in part to its decision that the limited partners were mandatorily obligated under paragraph 9 to make an additional capital contribution. In light of this court's

conclusion that the limited partners were not contractually obligated and/or were not required under any fiduciary duty to honor the call for additional capital, the precise foundation for the bankruptcy court's ruling on the fiduciary duty issue is uncertain.

The court therefore reverses and remands this case for a determination by the bankruptcy court as to whether, in light of this court's determination that the limited partners were not obligated to honor the call for additional capital, the limited partners who formed MN Associates breached any fiduciary duties so as to preclude recovery of attorneys' fees that they would otherwise be entitled to recover.

IT IS THEREFORE ORDERED that the March 8, 1991, decision of the bankruptcy court is reversed and remanded for proceedings consistent with this order and judgment.

make a capital contribution are those specified in the agreement.